UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| JANE C. HERNDON, | § |
| | § |
| v. | § Civil Action No. 1:20-cv-875 |
| | § |
| McLENNAN COMMUNITY COLLEGE | § |
| DBA McLENNAN SMALL BUSINESS | § |
| DEVELOPMENT CENTER | § |

## PLAINTIFF'S ORIGINAL COMPLAINT

*Plaintiff Herndon was the sole female Business Advisor with the McLennan Small Business Development Center (SBDC). When interviewing for the job, she alerted management that, as the sole caregiver for her chronically ill parent, she would have an ongoing need to use leave to provide such care. Leave was approved over the years, without SBDC's ever providing notice of her Family and Medical Leave Act rights. In late May 2019, prior to her annual review, she provided her boss with a self-assessment that raised concerns about her male peer's receiving more systemic support for achieving their economic impact targets. (She nevertheless outperformed her male peers in FY2018, and was on track to do so again by the end of FY2019.)*

*Within two weeks, she received a failing rating and was placed on a Performance Improvement Plan (PIP), though management was aware she had clients on the verge of receiving over $4 million in new funding. She objected that the PIP appeared to be retaliation for her speaking up about inequitable treatment. 15 days later, she was given notice of an upcoming termination, with no opportunity to complete the PIP. Even when presented with numerous statements from clients and community members praising her work, management refused to relent and fired her. With SBDC management apparently citing leave usage as one basis for its actions, she sues under FMLA, in addition to asserting discrimination/retaliation under Title VII/TCHRA.*

## II. JURISDICTION AND ADMINISTRATIVE EXHAUSTION[1]

1.  This Court has federal question (28 U.S.C. § 1331) jurisdiction because the suit arises under Title VII (prohibiting discrimination/retaliation on grounds among which is sex) and the Family and Medical Leave Act (FMLA).

2.  Per 28 U.S.C. § 1367, the Court has supplemental jurisdiction over the Texas Commission on Human Rights Act (TCHRA) claims, which arise from the same facts as the Title VII claims and provide overlapping relief.

3.  Sovereign immunity as to this local government defendant has been waived by Title VII/TCHRA and—at least as to leave taken to care for a family member (versus oneself)—the FMLA.

4.  Plaintiff timely exhausted her administrative remedies before bringing this suit. For example:

    4.1. As compared to the termination notice's being issued in June 2019, she filed a Charge of Discrimination concurrently with the EEOC and Texas Workforce Commission (TWC) around October 14, 2019 (i.e., roughly four months later).

    4.2. She obtained and attaches right-to-sue letters from EEOC and TWC, filing suit within the deadlines set out in those notices.

    4.3. No administrative exhaustion is required for her FMLA claims.

## III. PARTIES AND SERVICE

5.  Plaintiff is an individual, residing in McLennan County, Texas, who may be contacted by way of the undersigned attorney.

---

[1] Assertions in this pleading are made in addition and in the alternative to each other and apply to both causes of action. They are based on the limited information available pre-discovery and so subject to correction/clarification as the case develops.

6. Defendant McLennan Community College is a local government educational institution in Waco, Texas, and there hosts the McLennan Small Business Development Center, which is funded jointly by the U.S. Small Business Administration.

    6.1. Defendant is located at 1400 College Drive, Waco, TX 76708 and may be served by way of its President, Dr. Johnette McKown.

7. Plaintiff's complaint focuses on the wrongful acts and omissions of management of the Small Business Development Center. Notwithstanding her being fired from the SBDC, she continues to hold senior management of the college itself in high regard.[2]

## IV. RELEVANT FACTUAL CONTEXT

### A. Background on Plaintiff

8. Plaintiff Jane Herndon has an MBA from the Thunderbird School of Global Management and among her prior positions has served as a Global Market Development Manager for General Electric, Management Consultant with Cambridge Technology Partners, and Cloud Services Unit Director and Co-founder at Novell.

9. She interviewed and accepted a position with the SBDC in Waco based on management's representation that McLennan Community College was "family friendly" and that the job would allow her the flexibility to care for a parent with a chronic health condition (vascular dementia).

10. In the period at issue in this suit, Plaintiff was the only female Business Advisor working for the SBDC.

11. Her supervisor was Director Steve Surguy, a male.

---

[2] She exercises her right to file in a different division (Austin) within the Western District of Texas than that in which the events at issue arose (Waco), given the innumerable Waco and McLennan County residents who have ties to the college and to avoid unnecessary adverse publicity for it.

12. During her years at the SBDC, she regularly took approved leave to care for her relative.

13. At other times, she adjusted her schedule to provide care for the family member.

14. SBDC management was aware of this practice: Director Steve Surguy recounted to her multiple times with humor how he and his brother had told their mother with dementia that they were going for a drive, but instead checked her into a nursing home.

15. Prior to the position at issue here, over a 36-year business career, Plaintiff had never been disciplined, let alone fired for performance or conduct problems.

16. Plaintiff Jane Herndon loved her work and the small businesses she served. She was well-regarded by her SBDC clients and the entrepreneurial community—as confirmed by her service on local entrepreneurship boards and panels, national recognition for curriculum innovation, adjunct professorship at Baylor, and client testimonials excerpted below.

17. In the period leading up to the termination described below, management was aware that:

    17.1. Plaintiff had a client on the verge of receiving a $4.2 million Small Business Innovation and Research (SBIR) Fast Track grant from NIH that would create dozens of jobs.

    17.2. Another of her clients was in the process of obtaining a $600,000 SBA loan, while being on the verge of winning a $3 million DoD contract.

    17.3. These clients later did in fact obtain the described loan, grant, and contract.

### B. Pre-2019 Performance Evaluations

18. Not understanding why she was being fired, nor having been given a reason by her supervisor, client asked to review her personnel file during her exit interview with HR.

19. Upon reviewing the file, Plaintiff discovered her supervisor's deception: he had created a separate, more negative employee narrative for management. The official copies of

      Plaintiff's annual performance appraisals for 2017 and 2018 were less positive than the versions that had been provided to her. Director Surguy did this by replacing the performance evaluation originally delivered to and signed off on by Plaintiff.

20. He covered this deception by re-attaching the signature page from the original employee evaluation to the "new" narrative he created for management.

21. Director Surguy's input was written in red in the "positive" version provided to Plaintiff; in the "negative" version submitted to her personnel file, his input was written in blue.

    21.1. For example, the HR copy of her May 2018 rating said she was performing "below established goals," while the copy she was given had described her as "continually looking for ways to improve both professionally and personally."

    21.2. Similarly, the May 2017 HR copy of her rating said she needed to do "more timely collection of metrics," while the copy she had been given at the time said she was at the "top of the performance metrics," always looked "for ways to innovate," and had "gone above and beyond."

    21.3. These two years' appraisals, plus 2019's, would be used to justify her termination, for having a purported three years of unacceptable performance reviews.

22. Plaintiff asked HR, "Is it normal for managers to give one version of their appraisal to the employee and another version to management?," and HR replied, "No."

### C. May 29, 2019 Self-Assessment

23. In preparation for an upcoming annual review, Plaintiff provided Director Steve Surguy with a self-assessment of her performance around May 29, 2019.

    23.1. In it, she also noted concerns about inequitable distribution of professional-development and economic-impact opportunities.

23.2. The self-assessment demonstrated how she had outperformed the males in the office in 2017-2018, even though her numbers at mid-year had been deemed too low and were used to justify excluding her from an annual training conference.

D. June 10, 2019 Performance Meeting

24. In an unusual step, when Plaintiff Herndon met with Director Surguy to discuss her FY 2019 performance around June 10, 2019, they were joined by Surguy's boss, Dr. Frank Graves, the Dean for Workforce and Public Service.

25. To her surprise, she was informed that her performance was at a failing level and told she was being placed on a Performance Improvement Plan (PIP).

25.1. This was less than two weeks after she raised concerns about inequitable treatment.

26. She was told the problem was not an inability to do the work, but rather her "disrespect" of Surguy and others.

27. The rating and PIP described her as having "serious problems performing the majority of job duties."

28. It also asserted that she seldom was consistent in behavior, seldom met performance standards/expectations, and seldom supported innovation and exchange of ideas.

29. This failing rating was delivered to her within two weeks of her self-assessment raising equity concerns.

30. No questions were asked in this meeting about the self-assessment she had provided—it appeared to have been ignored.

31. When handed the PIP, Plaintiff made a comment along the lines of, "A PIP's something given to those you want out the door. Are you firing me?" Messrs. Surguy and Graves

immediately responded, "no" and reassured her the main intention was to improve her performance, not to be punitive.

31.1. This would soon turn out to be false.

32. As to the suggestion she did not show "respect," she explained that she believed respect "goes both ways" and suggested that her performance would be viewed more favorably if she were allowed as many "opportunities at bat" as the other (male) business advisors.[3]

### C. June 11, 2019 Response to PIP and Failing Rating

33. Around June 11, 2019, Plaintiff Herndon provided a written response to the failing rating.

34. She expressed concern that the negativity of the rating was due to retaliation for speaking up about "job-related inequities" and how metrics had been used to game the system (for example, male peers regularly were permitted to harvest numbers from clients whose investments and bank-loan processing pre-dated the advisor's role in the process).

35. She included a chart with data from Neoserra—the SBDC's Customer Relationship Management software and shared system of record—showing how she created superior client outcomes over six years—though having been allotted only a fraction of the client opportunities that were provided to her male peers.

### D. June 26, 2019 Notice of Termination

36. Around June 26, 2019, Plaintiff was called to a meeting with Director Surguy, which she assumed would be to provide further details of or discuss progress on the PIP she was on.

---

[3] For example, when a banker would alert Mr. Surguy that a significant small business loan was to be made, Surguy typically would attach himself to the transaction or assign it to one of the male advisors to take credit for it, not providing equal opportunities to Plaintiff to achieve related metrics.

37. Instead, some 16 days into the PIP, with no intervening event other than her expression of concerns about the propriety of the PIP/failing rating, she was given notice of termination.

    37.1. The termination was to be effective in August 2019 (per academic calendar).

38. That is, rather than use the information she had provided in response to weigh whether the PIP in fact was justified, management reacted to her protected activity of asserting disparate treatment by cutting the PIP short.

39. By ending the PIP after just over two weeks, Plaintiff was not allowed an opportunity to perform in a manner that management might find more acceptable.

40. She was not given an explanation at the time for the termination; instead, Mr. Surguy directed her to HR to get the details.

41. It appears that, if not related to her objections about disparate treatment, the termination was in response to her taking of leave to care for a seriously ill family member.

    41.1. For example, the failing appraisal alleges (grammar/spelling as in original) that "Jane's failure to attend scheduled meeting and appointments…has had and adverse impact on her level [of] integrity."

    41.2. In the June 10, 2019 performance meeting, Dr. Frank Graves acknowledged that Plaintiff's caring for her ill family member no doubt had been a burden.

### E. July 3, 2019 Meeting with Human Resources

42. About a week after being told she was being fired, Plaintiff met with an HR representative, who asserted the termination was due to three years of poor performance.

43. It was only in reviewing the official copies of the appraisals for 2018 and 2017 that she realized (as described above) that she had been given one description of her performance while a more negative account had been entered into the SBDC personnel records.

44. To no avail, Plaintiff explained to HR these were not the reviews she had been given.

45. Based on the limited information available, it appears Plaintiff's position was filled by a male, whether by making a part-time staff member full time or otherwise.

### F. Missed Opportunity for Course Correction

46. Prior to its effective date, Plaintiff requested that higher management at the Defendant college reverse SBDC's plan to fire her. Plaintiff documented for management how her clients and the entrepreneurial community held her in high regard, with these examples:

    46.1. "Jane was the best thing that ever happened to me in the start up process. I relied on her immensely, and she never disappointed. She had such amazing support, insight, professionalism, and creativity. I felt she was always on my side and appreciated any insight she could give. I recommended her many times to other start ups that I have met over the last few years, and would have no hesitation to recommend her in the future."

    —Melissa Pardun, Co-Owner, Maker's Edge Makerspace.

    46.2. "I have found Jane to have amazing knowledge and insight into technology and government contracting, and she has a unique and valuable skill of matching companies with customers and technology. She sometimes blows me away with her ability to see synergies. I was sad to hear she is leaving."

    —Dawn Cole, President, Kerberos International.

    46.3. "Jane has been positive, supportive, and helpful whenever I've consulted with her, and she's been available to others I've referred to her. She's a gift to Waco."

    –Luann Jennings, Consultant to Creative Waco; Startup Advisor.

    46.4. "Jane helped me immensely in the sale of my IT business" and "the startup & operation of my software company...She is a precious resource in the Waco business community."

    —Gus Welter, Carnegie Mellon University, Robotics Institute; Serial Tech Entrepreneur.

46.5. "Jane is amazing! Our #1 go-to person for business help and information. SO helpful & has so much knowledge!"

—Branda Pavlas, Co-Owner, Cuppiecakes.

46.6. "Jane has been a pioneer & leader in establishing a growing community wide entrepreneurial ecosystem."

—Chris McGowan, Urban Planner/Economic Developer, formerly with Greater Waco Chamber of Commerce; SDBC Contractor.

46.7. "I have found her creative, collaborative, innovative, positive, and active."

—Megan Henderson, Executive Director, City Center Waco.

46.8. "Extremely knowledgeable about small business and I know my business would not be as far along without Jane's guidance."

—Jerry Snider, Health & wellness author; Owner, Luna Juice Bar and All In Health and Wellness

46.9. "Jane always exhibited professionalism and respect for people of all different backgrounds, cultures, etc."

—Courtney Rogers, Founder and former owner, Co-Town Crepes at the Silos; Serial Entrepreneur.

46.10. "Jane was always willing to offer advice for my small business, referred clients & was my cheerleader."

—Lisa Hull, CPA, WacoAccounting.com; VP, Community Bank and Trust.

46.11. "Amazing person who loves helping others better themselves and their communities."

—Aaron Jetelina, Photographer; owner, WTX Media; Serial Entrepreneur.

46.12. "…gone above and beyond in helping us over the years to identify opportunities and successfully pursue them to where we are now (finally) getting traction on our technologies and beginning to hire."

—John Fitch, Inventor; Owner, Birkeland Current; Serial Tech Entrepreneur.

46.13. "Jane has been a fantastic resource and always goes above and beyond what is required of her."

—Glenn Meyerowitz, Inventor; Test Engineer (SpaceX).

46.14. "She was always engaging, helpful, and extremely professional."

—David Niemann, Owner, DTE Solar.

46.15. "…helpful and positive throughout my experience…prepared for our meetings on time with positive ideas…Jane's guidance helped me see flexible opportunities and contributed to my growth that has allowed for Waco job creation and a profitable small business."

—Dr. Kelsey Baas, Owner, Compleo Physical Therapy & Wellness.

46.16. "Jane was always proactive, finding ways to add massive value and ensure I knew SBDC was always there to keep supporting my businesses. Every interaction was professional and I was impressed by her experience."

—Gidon Rosing, Director, Waco Food Hub.

46.17. "Seldom have I had such confidence in a consultant."

—Susan Cowley, Executive Director, Talitha Koum Institute.

46.18. "Jane is highly intelligent & a team player."

—Barry Vokes, Retired Business Owner; President, McLennan County Master Gardener Association.

47. As well, of 15 SBDC clients who provided related input, all answered "always" as to how frequently she showed respect to others, was supportive of SBDC and her colleagues there, demonstrated professionalism, strove for excellence, and pursued innovative solutions.

48. In spite of all that, the SBDC's plan to fire Plaintiff was allowed to proceed.

### G. FMLA Background

49. Defendant has over 50 employees at the location where Plaintiff worked and is a local government agency.

50. Plaintiff had worked for Defendant in excess of 12 months prior to the PIP/failing rating and termination.

51. Plaintiff worked at least 1,250 hours in the 12 months prior to the PIP/failing rating and termination.

52. Plaintiff regularly took leave in the 12 months prior to the PIP/failing rating in order to care for a parent who has a serious health condition (dementia).

53. SBDC Director Steve Surguy was aware that Plaintiff was taking leave to care for the serious health condition of her parent.

54. SBDC Director Surguy did not notify Plaintiff that the leave requested and taken could be subject to protection under the Family and Medical Leave Act.

55. SBDC Director Surguy in fact never mentioned the FMLA to Plaintiff.

56. Plaintiff's use of leave to care for the serious health condition of a parent did not ever exceed 12 work weeks in any 12-month period during her employment with the SBDC.

    56.1. In fact, her total of all forms of leave taken in a year never surpassed 12 weeks.

57. Director Surguy never asked Plaintiff to provide proof that she was using leave to care for a parent with a serious health condition.

58. Prior to June 2019, Director Surguy never indicated to Plaintiff that she was taking excessive leave.

59. Prior to June 2019, Director Surguy never indicated to Plaintiff that she needed to reschedule leave in order to attend a work-related meeting.

60. Prior to June 2019, Director Surguy never indicated to Plaintiff that the frequency or timing of her taking leave had an adverse effect on her job performance.

61. One or more of Plaintiff's male peers took sick leave during 2018 and 2019, but were not terminated.

62. Between 2017 and 2019, Plaintiff missed only one appointment with a client without advance notice.

    62.1. She promptly apologized to the client.

    62.2. She promptly rescheduled the appointment.

    62.3. That client later was among those who provided written statements (as excerpted above) praising Plaintiff's SBDC work.

63. As a result of being terminated and then during the ensuing period of unemployment, Plaintiff was not able to take leave to care for her parent while still receiving a salary and benefits such as health insurance.

64. The failing rating given to her in June 2019 and used to justify the termination falsely asserted that Plaintiff's failure to attend scheduled meetings and appointments had an adverse impact on her "integrity."

## V. LEGAL CLAIMS

### A. FMLA Interference

65. Plaintiff was entitled to take FMLA leave as a person employed for a sufficient number of hours by a government employer and as a person who has a parent with a serious health condition.

66. Defendant interfered with Plaintiff's ability to exercise her FMLA rights.

    66.1. For example, it terminated her in a period overlapping when she otherwise would have taken leave to care for a parent with a serious health condition.

67. But for the termination, Plaintiff would have remained an employee of Defendant who periodically took leave to care for a parent with a serious health condition.

68. Claims that Plaintiff deserved termination are rebutted by the fact she was told at the June 10, 2019 meeting that there was not a plan to terminate her and instead she was being provided an opportunity to improve her performance. But she then was terminated without being provided such an opportunity.

69. Plaintiff's use of leave was mentioned as part of notifying her that her performance was said to be failing, in that it was asserted she had missed meetings and appointments.

    69.1. The missed meetings were ones for which she had requested and been granted leave, without notice to her that the leave should have been rescheduled.

70. Defendant was aware that Plaintiff was held in high regard by her clients and the local business community, yet nonetheless proceeded to terminate her.

71. This interference with Plaintiff's exercise of her rights to take leave for FMLA purposes caused her to suffer damages, among which has been hiring an attorney to defend her.

### B. FMLA Retaliation

72. In addition to what is set out above for the FMLA interference claim, Plaintiff asserts that there is a causal connection between her taking leave for FMLA purposes and the adverse action of her being terminated.

73. For example, Director Surguy claimed she had missed meetings and appointments, when in fact she missed one appointment and had been on approved leave during the missed network meetings he referenced.

C. <u>FMLA Relief</u>

74. In light of Defendant's violation of the FMLA, whether by interference, retaliation, or both, Plaintiff seeks a declaration that the Act was violated by Defendant; an order that Defendant retroactively reinstate her; and an award of attorney fees, expenses, and costs; as well as any other relief to which the Court may find her to be entitled.

D. <u>Sex Discrimination</u>

75. Plaintiff's rights to be free from discrimination based on her sex (female) under the federal Title VII law and the Texas Commission on Human Rights Act were violated by Defendant when it gave her a failing rating and terminated her.[4]

   75.1. For example, her male peers were held to lower performance standards and/or had work routed to them in a manner to artificially inflate their ability to achieve success under applicable performance metrics.

   75.2. She would not have been fired but for being a woman, or at least her being one was a motivating factor in the decision to fire her.

      75.2.1. For example, she was described as failing to show adequate respect to her male colleagues, yet it was not unusual for them to look at each other and roll their eyes while she spoke at SBDC meetings, and the males involved received no corrective action for doing so.

   75.3. As well, male peers who were absent from the office for reasons other than tending to a sick family member were not given failing ratings and terminated.

---

[4] Plaintiff alternatively raised in the EEOC charge, and does so here as well, a claim of associational disability discrimination, based on her relationship to the family member with dementia. That is, she was treated worse than her peers because she had a family member with a disability.

      75.3.1. This is a form of gender discrimination in that family caregiving roles traditionally fall to females.

  75.4. Claims that Plaintiff "seldom" met performance standards are false, such as is demonstrated by the praise of Plaintiff from clients and community members.

  75.5. In light of Defendant's discrimination against her, Plaintiff seeks a declaration that Defendant discriminated against her; an award of compensatory damages; retroactive reinstatement; an award of attorney fees, expenses, and costs; and any other relief determined by the court to be appropriate.

### E. EEO Reprisal

76. Under anti-discrimination laws like Title VII and TCHRA, Plaintiff had a protected legal right to object to employer actions that she in good faith believed to reflect discrimination.

  76.1. For example, she had the right to describe in her self-assessment how her male peers were being provided with more professional opportunities than she was.

  76.2. She likewise had the protected legal right to respond to the failing rating and PIP by objecting that she was being held to higher standards than male counterparts.

  76.3. Management was aware of this protected activity and took adverse actions against her in period of time soon enough thereafter to suggest they were related.

      76.3.1. That is, not long after her self-assessment contended she was being given fewer opportunities than her peers who were males, her performance was deemed to be failing and she was placed on a PIP.

      76.3.2. When she engaged in further EEO activity, objecting that the PIP and failing rating were discriminatory, soon thereafter she was given notice of being fired, rather than being allowed a chance to try to pass the PIP.

77. In light of Defendant's retaliation against her, Plaintiff seeks a declaration that Defendant violated the law; an award of compensatory damages; retroactive reinstatement; an award of attorney fees, expenses, and costs; and any other relief determined to be appropriate.

## PRAYER

FOR SUCH REASONS, Plaintiff requests that judgment be entered in her favor, Defendant be denied relief, and that she be awarded all other relief determined by the Court to be appropriate, among which should be: findings that Defendant violated the law; retroactive reinstatement to the position with Defendant; voiding of adverse personnel records such as the PIP and failing rating; compensatory damages; liquidated damages under the FMLA; attorney fees, expenses, and costs; and pre- and post-judgment interest.

Plaintiff finally asks that Defendant's SBDC be required to submit regular reports to the Court to ensure it does not engage in further violations of the nature described above.

Respectfully Submitted,

SCHLEICHER LAW FIRM, PLLC

By: _____
David R. Schleicher
TX Bar No. 17735780
david@gov.law

1227 N. Valley Mills Dr., Ste. 208
Waco, Texas 76710
(254) 776-3939
(254) 776-4001 fax

ATTORNEYS FOR PLAINTIFF HERNDON

DocuSign Envelope ID: A9819D87-4FDC-4622-8A14-342D25CADBA2

# Texas Workforce Commission
A Member of Texas Workforce Solutions

Bryan Daniel, Chairman
Commissioner Representing
the Public

Julian Alvarez
Commissioner Representing
Labor

Aaron Demerson
Commissioner Representing
Employers

Edward Serna
Executive Director

August 19, 2020

## NOTICE OF COMPLAINANT'S RIGHT TO FILE CIVIL ACTION

Jane C. Herndon
c/o David Schleicher
Schleicher Law Firm
1227 N. Valley Mills Drive, Ste. 208
Waco, TX  76708

Re:   *Jane C. Herndon v. McLennan Community College*
       EEOC Complaint # 450-2020-00322

Dear Ms. Herndon:

The above-referenced case was processed by the United States Equal Employment Opportunity Commission or a local agency. Pursuant to Sections 21.252 and 21.254 of the Texas Labor Code, this notice is to advise you of your right to bring a private civil action in state court in the above-referenced case. YOU HAVE SIXTY (60) DAYS FROM THE RECEIPT OF THIS NOTICE TO FILE THIS CIVIL ACTION.

If your case has been successfully resolved by the U. S. Equal Employment Opportunity Commission or another agency through a voluntary settlement or conciliation agreement, you may be prohibited by the terms of such an agreement from filing a private civil action in state court pursuant to the Texas Commission on Human Rights Act, as amended.

The United States Supreme Court has held in *Kremer v. Chemical Construction Corporation*, 456 U.S. 461 (1982), that a federal district court must generally dismiss a Title VII action involving the same parties and raising the same issues as those raised in a prior state court action under Chapter 21 of the Texas Labor Code. Therefore, filing a lawsuit in state court based on the issuance of this notice of right to file a civil action may prevent you from filing a lawsuit in federal court based on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e - <u>et seq</u>.

Sincerely,

Bryan D. Snoddy
Interim Executive Director, Civil Rights Division

**RETAIN ENVELOPE TO VERIFY DATE RECEIVED**

Copy to:
McLennan Community College
1400 College Drive
Waco, TX 76708



**EXHIBIT A**

U.S. Department of Justice

Civil Rights Division

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson , EMP, PHB, Room 4701*
*Washington, DC 20530*

August 06, 2020

Ms. Jane Herndon
c/o David Schleicher, Esquire
Schleicher Law Firm
1227 N. Valley Mills Drive
Suite 208
Waco, TX  76708

Re:  EEOC Charge Against McLennan Community College, Waco
     No. 450202000322

Dear Ms. Herndon:

Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

The investigative file pertaining to your case is located in the EEOC Dallas District Office, Dallas, TX.

This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

Sincerely,

Eric S. Dreiband
Assistant Attorney General
Civil Rights Division

by      /s/ Karen L. Ferguson
Karen L. Ferguson
Supervisory Civil Rights Analyst
Employment Litigation Section

cc: Dallas District Office, EEOC
    McLennan Community College, Waco

**EXHIBIT B**